# UNITED STATES DISTRICT COURT

__NORTHERN__ _____ DISTRICT OF ___ __ILLINOIS, EASTERN DIVISION__

UNITED STATES OF AMERICA

v.

LUIS PACHECO, aka "CITO", and
ANGEL VEGA, aka "LEFTY"

**FILED**
2-20-08
FEB 20 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

MAGISTRATE JUDGE NOLAN

**CRIMINAL COMPLAINT**

CASE NUMBER:

**08CR   0144**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my

knowledge and belief. Starting no later than __May 2005__, and continuing until __December 2006__, in __Kane and Cook__

Counties, in the __Northern__ District of __Illinois__, defendants did,

> conspire with each other, and with others known and unknown, to knowingly and intentionally possess with intent to distribute and to distribute controlled substances, namely, in excess of 500 grams of mixtures containing cocaine, in violation of Title 21, United States Code, Section 841(a)(1),

in violation of Title ___21___ United States Code, Section __846 and Title 18, United States Code, Section 2__.

I further state that I am a __Special Agent with the Federal Bureau of Investigation__ and that this complaint

is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof: __X__ Yes _____ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

__February 20, 2008_____ at __Chicago, Illinois_____
Date                                               City and State

__NAN R. NOLAN, U.S. Magistrate Judge__     _____
Name & Title of Judicial Officer                       Signature of Judicial Officer

STATE OF ILLINOIS   )
                        )     SS
COUNTY OF COOK     )

# A F F I D A V I T

I, Michael J. Culloton, Special Agent of the Federal Bureau of Investigation, United States Department of Justice, having been duly sworn under oath, states as follows:

## I.    INTRODUCTION

1.    I am a Special Agent ("SA") of the Federal Bureau of Investigation("FBI"), United States Department of Justice, and have been so employed for approximately ten years.    I am currently assigned to the West Suburban Gang Task Force.    As part of my official duties, I investigate criminal violations of the federal narcotics laws, including, but not limited to, Title 21, United States Code, Sections 841, 843 and 846, and federal firearms laws including, but not limited to, Title 18, United States Code, Sections 922 and 924(c).

2.    During my employment as an FBI Special Agent, I have received specialized training in the means and methods by which drug traffickers unlawfully manufacture, import, distribute and possess with intent to distribute controlled substances, including, but not limited to, the use of mobile telephones and code words to conduct drug trafficking activities; and the enforcement of laws concerning the trafficking of controlled substances.

3.    I have also received training regarding, and have

personally participated in, various types of investigative activity, including, but not limited to, the following: (a) physical surveillance; (b) the debriefing of defendants, witnesses, informants and other individuals who have knowledge concerning the unlawful trafficking in controlled substances and the unlawful possession and use of firearms; (c) undercover operations; (d) the execution of search warrants; (e) the consensual monitoring and recording of conversations; (f) electronic surveillance through the use of pen registers and trap and trace devices; (g) the court-authorized interception of both wire and electronic communications (i.e., Title III wiretaps); and (h) the handling and maintenance of evidence.

4.    The statements made in this Affidavit are based in part on: (a) my personal participation in this investigation; (b) information provided to me by other law enforcement officers and witnesses; (c) information provided to me and other law enforcement officers by confidential witnesses and cooperating witnesses who have proven reliable and provided information which has been independently corroborated, as set forth in part, herein; (d) analysis of pen register and trap and trace data; (e) review of consensually monitored and/or recorded conversations; (f) review of wire communications intercepted pursuant to Court order; (g) laboratory analysis reports; (h) criminal history records maintained by various law enforcement agencies, including those in

2

the possession of the National Criminal Information Center ("NCIC"); (i) the training and experience of myself and other law enforcement agents and officers.

5.    This Affidavit is made for the limited purpose of establishing probable cause in support of a Criminal Complaint charging that beginning no later than in or about May 2005 and continuing through and including in or about December 2006, ANGEL VEGA, also known as "LEFTY," and LUIS PACHECO, also known as "CITO," conspired with each other and with others known and unknown to the United States to knowingly and intentionally possess with intent to distribute and to distribute a controlled substance, namely, in excess of 500 grams of mixtures containing cocaine, in violation of Title 21, United States Code, Section 841(a)(1), in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

6.    Since this Affidavit is for the limited purpose of establishing probable cause to support the Criminal Complaint for the named defendants, it contains only a summary of relevant facts. I have not included each and every fact known to me concerning the entities, individuals, and the events described in this Affidavit.

## II.  OVERVIEW OF CONSPIRACY

7.    The FBI and the Elgin Police Department ("EPD") have been investigating drug trafficking activities of ANGEL VEGA, also known

as "LEFTY"[1] and his associates.  Based on the investigation, it is believed that ANGEL VEGA, along with his co-conspirators, distribute quantities of cocaine in and around the area of Elgin, Illinois, a suburb of Chicago.

## III. OVERVIEW OF INVESTIGATION

### A.    The Confidential Witness

8.    Confidential Witness 1 ("CW 1")

a.    CW1 has been providing reliable, timely information to the FBI concerning this investigation since approximately February 2005.  During this investigation, FBI agents have spoken to CW1 in person or telephonically, on numerous occasions. A substantial portion of CW1's information regarding ANGEL VEGA has been corroborated, in part, by independent investigation which includes court authorized interceptions, physical surveillance, telephone records and by other Cooperating Witnesses.  Information provided by CW1 is based upon either first hand knowledge or from individuals with first hand knowledge who provided CW1 with information regarding the events referred to.

b.    CW1 has been arrested approximately three times between 2003 and 2005, two state retail theft arrests, and an arrest for failure to appear as a result of one of the retail theft cases. CW1 was given probation and ordered to attend drug court for one

---

[1]According to information obtained from EPD, ANGEL VEGA uses the nickname "Lefty."

year.  In Fall 2005, CW1 was arrested as a result of a positive urinalysis test.  CW1  successfully completed probation in Spring of 2006.

c.  CW1 has agreed to cooperate with the government in exchange for payment.  To date, CW1 has been paid approximately $4,300 for his/her cooperation.

### B.   The Wiretap Investigation

9.  Pursuant to an order signed by Chief Judge James F. Holderman on July 5, 2006, the FBI began monitoring telephone conversations on telephone number (847)770-7441("Target Phone 3"), a cellular phone used by ANGEL VEGA.  On August 25, 2006, Chief Judge James F. Holderman signed an order authorizing the continued interception of telephone conversations over Target Phone 3 for a 30-day period.

10.  On November 27, 2006, Chief Judge James F. Holderman signed an order authorizing the interception of wire communications occurring to and from telephone number (773) 454-0597 ("Target Phone 5"), a cellular telephone used by LUIS PACHECO.

11.  In many of the intercepted calls in the investigation, coded language was used to conceal the true nature of the telephone calls.  At various points in this Affidavit, I have placed in parentheses my understanding of what was being said during these calls.  My understanding of what was being said during these calls is based on the contents and context of the conversations, my

5

experience as an FBI Special Agent, statements made to me or other law enforcement officers by CW1, and the experience of other law enforcement agents and officers in this investigation, and the totality of evidence gathered to date in the investigation. The times listed for these calls are approximate. Finally, the summaries below do not include all potentially criminal calls intercepted during the period of interception, or all statements or topics covered during the intercepted conversations. The material included within quotation marks in this Affidavit is based on summaries or draft transcripts-not final transcripts.

IV. PROBABLE CAUSE

A. Statements Made by CW1 to Law Enforcement Regarding the Drug Trafficking Operation of ANGEL VEGA[2]

12. On several dates, CW1 has provided information to FBI agents and EPD officers regarding ANGEL VEGA and his associates. This Affidavit does not include each and every fact known to CW1

---

[2]The identification of ANGEL VEGA in this Affidavit is based upon the following: First, CW1 has identified VEGA. Second, during certain intercepted calls, an individual believed to be VEGA arranged to personally meet with PACHECO and customers of the conspiracy and those meetings were surveilled by law enforcement. Agents, who were familiar with VEGA from having viewed a driver's license photograph of him and photographs provided by CW1, and based on other dealings with VEGA, recognized VEGA during surveillance. For example, an Elgin detective recognized VEGA as an employee of The Elgin Rec Center with whom he has had previous dealings. Third, law enforcement has been able to identify VEGA's voice because that voice has been intercepted numerous times, particularly on Target Phone 3, because VEGA was identified or identified himself in many of those calls with the name "ANGEL" or "LEFTY."

concerning VEGA and his associates but is a summary of information CW1 provided.

13.    CW1 has known Vega for approximately 12 years.    During this time, CW1 has had almost daily contact with VEGA.    Based on CW1's contact and conversations with VEGA, CW1 has advised that ANGEL VEGA sold cocaine since the time that he/she has known VEGA and continuing until approximately December 2006.

14.    CW1 advised that on May 26, 2006, VEGA asked CW1 to go to the store and purchase "Inositol".    This conversation was not recorded.    According to CW1, VEGA uses Inositol to mix and cut cocaine in order to increase the volume of the cocaine.    According to CW1, VEGA mixed the cocaine and Inositol in the upstairs bathroom of VEGA's residence located at 418 Lowrie Court residence, Elgin, Illinois.    CW1 has seen VEGA cut the cocaine multiple times and last saw him cut cocaine in the 418 Lowrie Court address in the summer of 2005.    CW1 reported that since that time, VEGA has found an apartment (hereinafter "the apartment") to store and cut cocaine although CW1 was not aware of the location of the apartment.

15.    On approximately June 11, 2006, CW1 had a telephone conversation in which VEGA told CW1 he was at the apartment[3] and waiting for someone to leave so he can do his business.    This call was not recorded.    CW1 understood this to mean that VEGA did not

---

[3]Based on the investigation, your Affiant believes that this apartment is located at 507 Ryerson in Elgin, Illinois for reasons set forth in paragraph 30.

want to cut the cocaine with someone else in the apartment. VEGA told CW1 that he would have to go to Chicago for Inositol in the future because when he went to the area mall on June 10, 2006, the store clerk wrote down his name and address when he purchased the Inositol. VEGA also told CW1 that he wanted to move some old clothes and blankets into the apartment to make it look like someone was living there so the neighbors do not get suspicious.

16.   CW1 identified a photograph of LUIS PACHECO[4] as an individual known to CW1 as "CITO." According to CW1, ANGEL VEGA told CW1 that PACHECO supplied ANGEL VEGA with cocaine.

17.   CW1 stated PACHECO "fronted" cocaine to VEGA, meaning that PACHECO provided the cocaine on credit to ANGEL VEGA, and VEGA repaid PACHECO at a later time. In or about June, 2006, CW1 was present with ANGEL VEGA at The Riverboat Casino in Elgin. ANGEL VEGA told CW1 that he had money to pay PACHECO, and further instructed CW1 to get a drink. CW1 saw VEGA with a large amount of cash before this meeting with PACHECO at the casino and believed VEGA did not want CW1 around when he met with PACHECO to pay money.

---

[4]The identification of LUIS PACHECO in this Affidavit is based upon the following: First, CW1 has identified the individual that he/she knows as "CITO" from an Illinois driver's license photograph of LUIS PACHECO. Second, PACHECO identified himself to affiant and EPD officers following an investigative stop of PACHECO on 12/19/2006. Third, during particular intercepted calls, PACHECO arranged to personally meet with VEGA. Agents conducted surveillance based on the intercepted calls and recognized PACHECO from a driver's license photograph they had seen of PACHECO. Finally, during the intercepted calls, PACHECO identifies himself as "CITO."

8

CW1 further stated ANGEL VEGA sometimes used CW1's vehicle to avoid detection of law enforcement whom ANGEL VEGA believed recognized VEGA's car. CW1 stated that ANGEL VEGA drove to PACHECO's house in Hanover Park to meet PACHECO and obtain cocaine from him.

### B.    July 17, 2006 Calls Between LUIS PACHECO and ANGEL VEGA Regarding Obtaining Cocaine.

18.    On or about  July 17, 2006,  at approximately 11:49 a.m., Target Phone 3 received a voice mail from LUIS PACHECO using "Pacheco Phone A."[5] (#447). PACHECO left a message stating "ANGEL, CITO, I'm going over there, give me a call."

19.    At approximately 11:52 a.m., PACHECO, using Pacheco Phone A,[3] called ANGEL VEGA on Target Phone 3 (#449). Before this call connected, agents overheard a background conversation between PACHECO and an unidentified male. The unidentified male ("UM") stated, "here, I'll give you 20-40-60-80-3. It's 5 right?" PACHECO responded, "If that's what you want, the regular." Your Affiant believes that the UM was counting money and PACHECO was referring to the amount of cocaine to be purchased by the UM. When PACHECO referred to "the regular," I understood him to mean the same quantity of narcotics that the UM typically purchased from PACHECO. The UM responded "...but if ANGEL comes with your money"

---

[5]Pacheco Phone A is a cellular telephone which was used by PACHECO with the telephone number (630) 400-1454. The last intercepted telephone call between Target Phone 3 and Pacheco Phone A occurred on or about July 23, 2006. PACHECO was intercepted over Target Phone 3 using a new phone, Target Phone 5, on August 30, 2006.

(which your Affiant believes to be a reference to ANGEL VEGA owing PACHECO money in payment for narcotics). ANGEL VEGA then answered the call and told PACHECO that he was working. PACHECO asked if ANGEL VEGA had lunch yet because he was going to be out there by 1:00. ANGEL VEGA asked PACHECO if he was "coming by this way?" PACHECO replied that he was going over to his brother's house. ANGEL VEGA told PACHECO that they would figure it out.

20. At approximately 1:15 p.m., ANGEL VEGA, using Target Phone 3, called PACHECO on Pacheco Phone A and asked PACHECO if he was coming by (#451). PACHECO said that he had to wait for someone to check his brother's air conditioning and he could then head that way. ANGEL VEGA stated that he would head out that way. PACHECO stated "okay, I'll wait for you here then." At approximately 1:30 p.m., surveillance agents ("surveillance") observed ANGEL VEGA enter an apartment building located at 1295 Bamberg Court (hereinafter the "Bamberg Court apartment building)[6] where a black Ford Expedition, license plate 18189 US (hereinafter the "Ford Expedition"), was parked.[7] At approximately 1:54 p.m., surveillance

_____

[6]Based on information provided by CW1 and an intercepted call, Frankie Pacheco is believed to be the brother of Luis Pacheco. Vehicle registration records (see Footnote 7) reflect an address for Frankie Pacheco of 1295 Bamberg Court in Hanover Park, Illinois.

[7]LUIS PACHECO is known to agents to drive the Ford Expedition which is registered in the name of Frankie Pacheco at 1295 Bamberg Court, Hanover Park, Illinois. Surveillance has observed PACHECO driving this vehicle on at least 10 occasions. On December 19, 2006, law enforcement agents stopped PACHECO as

10

observed ANGEL VEGA leaving the location.  Your Affiant believes
that PACHECO supplied ANGEL VEGA with a quantity of cocaine.

> **C.    September 6, 2006 Distribution of Cocaine from LUIS
> PACHECO to ANGEL VEGA and Seizure of 6.2 Grams of
> Cocaine.**

21.   On or about September 5, 2006, at approximately 6:28
p.m., PACHECO, using Target Phone 5, called ANGEL VEGA and left a
message on Target Phone 3 (#1551).  PACHECO stated, "it's me CITO,
call me back when you get a chance, 454 number."  Affiant
understands that the "454 number" was a reference to Target Phone
5 which was telephone number (773) 454-0597.

22.   At approximately 6:35 p.m. ANGEL VEGA, using Target Phone
3, called PACHECO, using Target Phone 5, and asked PACHECO what was
going on (#1557).  PACHECO replied that he was hoping to get some
"cheesy."  ANGEL VEGA replied that it was fine because he has had
a lot of phone calls, which your Affiant believed to be a reference
to calls from narcotics customers.  PACHECO stated that he saw his
guy this weekend at a barbeque and PACHECO was told he was good for
tomorrow.  ANGEL VEGA replied, "that's cool."  PACHECO stated that
he would go to ANGEL VEGA but would call ANGEL VEGA first.  Affiant
understands that during this intercepted conversation ANGEL VEGA
and PACHECO were arranging to meet to conduct a narcotics
transaction, and that PACHECO wanted "cheesy," referring to money,
from ANGEL VEGA.

---

he was driving the Ford Expedition, see paragraph 36.

23.   On or about September 6, 2006,  at approximately 11:02 a.m., PACHECO, using Target Phone 5, called ANGEL VEGA on Target Phone 3 (#1569).   PACHECO told ANGEL VEGA that he would "be there by 12."   ANGEL VEGA asked, "you'll be there by 12:00?"   PACHECO replied, "I'm on my way now."

24.   Following this call, fixed surveillance was established at the Bamberg Court apartment building in Hanover Park, Illinois[8] as well as mobile surveillance on ANGEL VEGA.

a. At approximately 11:40 a.m., surveillance saw PACHECO exit the Ford Expedition (see footnote 7) with tan molding on the bottom, and enter the Bamberg Court apartment building carrying a yellow envelope in his hand.

b.   At approximately 11:46 a.m., your Affiant observed ANGEL VEGA leaving his place of employment, The Elgin Rec Center, also referred to as "God's Gym."[9]  Surveillance followed ANGEL VEGA to the area of the Bamberg Court apartment building and saw him enter the building at approximately 12:04 p.m.

c.   After approximately fifteen minutes, ANGEL VEGA exited the Bamberg Court building apartment and returned to his

_____

[8]As previously set forth in Footnote 5, PACHECO's brother, Frankie Pacheco, resides at this address.

[9]VEGA is known to be employed by God's Gym based on public statements made by VEGA at speaking engagements where an Elgin detective was present.  The same detective, who is a gang specialist, has also contacted VEGA at God's Gym in conjunction with VEGA's role as a gang interventionist and counselor. Finally, VEGA is listed by the City of Elgin as an employee.

vehicle. Surveillance observed a yellow envelope sticking out of the front pocket of ANGEL VEGA's pants. Surveillance did not observe the yellow envelope on VEGA when he entered the Bamberg Court apartment building. Surveillance saw ANGEL VEGA go to the rear driver's side door of his vehicle and pull the back seat down, and place the envelope behind the rear seat and then open the trunk and appear to move items in the trunk.

25. Based on these observations, your Affiant believes that ANGEL VEGA hid the yellow envelope he had obtained from the Bamberg Court apartment building between the back seat and the trunk of his vehicle. Surveillance followed ANGEL VEGA as he drove his vehicle from the Bamberg Court apartment building to an apartment located at 507 Ryerson Avenue in Elgin. An Elgin Police Detective observed ANGEL VEGA as he parked the vehicle in the rear of the driveway at approximately 12:44 p.m.

26. Earlier that same day, at approximately 9:09 a.m., INDIVIDUAL E had called ANGEL VEGA on Target Phone 3 (#1562) and asked ANGEL VEGA if there "was a chance to do something today." ANGEL VEGA responded, "something can be done, just the same kind." Affiant understood that Individual E wanted to purchase cocaine from ANGEL VEGA.

27. Surveillance was maintained on ANGEL VEGA on September 6, 2006 after he left the Ryerson address. Surveillance specifically observed ANGEL VEGA as he arrived at, entered, exited and later

13

returned to the Elgin Rec Center.  On this date, surveillance observed ANGEL VEGA driving a gold-colored Buick, bearing Illinois license plate 500 5063 (hereinafter "the Buick").  At approximately 4:38 p.m., surveillance observed Individual E arrive at the Elgin Rec Center driving a red four-door Mercury Sable.  Surveillance observed Individual E as she entered the gym and exited less than two minutes later and drove away from the Elgin Rec Center.  At approximately 4:40 p.m., surveillance observed Individual E as she drove from the gym.  During this time that Individual E was at the Elgin Rec Center, the Buick that ANGEL VEGA was observed driving, remained in the parking lot outside of the Elgin Rec Center.

28.  Members of the EPD, who were in contact with the agents monitoring intercepted telephone calls, stopped Individual E's car at approximately 4:42 p.m. Individual E was asked to step out of the vehicle and, when outside the car, further asked to remove the contents of her pockets.  Individual E removed a plastic baggie from her pocket and attempted to cup it in her hand.  Officers recovered the baggie that contained a white powdery substance.  The substance was subsequently submitted to the Drug Enforcement Administration ("DEA") North Central Laboratory which determined the substance was 6.2 grams of 68% pure cocaine hydrochloride.

29.  Based on the above surveillance and intercepted calls, affiant believes that VEGA provided the 6.2 grams of cocaine to Individual E.

D.    Execution of Search Warrant at 507 Ryerson, Elgin, IL
and Seizure of Cocaine and Narcotics Paraphernalia

30.   On September 7, 2006, the FBI and EPD executed a state
search warrant at 507 Ryerson in Elgin, Illinois, the lower level
apartment, believed to be used by ANGEL VEGA to store cocaine, cut
the cocaine and repackage it.  Based on information obtained from
a vehicle tracking device[10] installed on the Ford Escape indicating
the presence of the Ford Escape in the area of 507 Ryerson,
observations made by surveillance who observed VEGA in the area of
507 Ryerson, and information provided by CW1 that ANGEL VEGA was
using an apartment as his "stash location," it is believed that
VEGA used the apartment located at 507 Ryerson in Elgin, Illinois
as the place to store, "cut", and package cocaine for resale.  More
specifically,  information  obtained  from  the  tracking  device
indicated that the Ford Escape was in the area of 507 Ryerson on
approximately 12 occasions during the 60-day period that the
tracker was installed.  Additionally, surveillance observed VEGA in
the area of 507 Ryerson on approximately five additional occasions.
On these occasions, ANGEL VEGA was in a vehicle other than the Ford
Escape. As part of the investigation, agents interviewed the owner
of the building located at 507 Ryerson, who told agents that he/she

_____

[10] On or about July 13, 2006, Chief Judge Holderman entered
an order authorizing the installation of a vehicle tracking
device on the Ford Escape known to be driven by ANGEL VEGA.
After installation of the device, on July 14, 2006, surveillance
agents observed ANGEL VEGA driving the Ford Escape to the area of
507 Reyerson in Elgin.

leased an apartment to an individual known to him as Individual A. According to the property owner, Individual A never moved into the apartment. Instead, Individual A told the property owner that a friend would be moving into the apartment. The property owner identified a driver's license photograph of ANGEL VEGA as the individual he/she knew as the friend and the individual using the apartment. The lower apartment located at 507 Ryerson in Elgin, Illinois had a bed in the bedroom closest to the front entrance and a table next to the bed with no other furniture in the two-bedroom apartment. There was also an empty duffle bag and a couple of jackets or sweatshirts in the closet of the same bedroom. With the exception of these items, the apartment did not appear to be occupied.

31. Among the items that agents recovered during the search were the following:

(a) a clear plastic bag containing approximately 253.2 grams of a white powdery substance inside a brown mailing envelope. The substance was analyzed by the DEA lab as 91% pure Cocaine Hydrochloride. Three fingerprints, identified and found to consist of PACHECO's, were recovered from the brown mailing envelope. The substance containing 253.2 grams of cocaine;

(b) a clear plastic bag containing a white powdery substance. This substance was analyzed by the DEA lab as residue amounts of Methamphetamine;

16

(c) a clear plastic bag containing approximately 6.2 grams of a white powdery substance.  This substance was analyzed by the DEA lab as 68% pure Cocaine Hydrochloride;

(d) miscellaneous packaging items with residue including two metal pans and a Kitchen Gourmet Food Processor.  This substance was analyzed by the DEA lab as having Cocaine Hydrochloride residue);

(e) two yellowish-brown envelopes, similar to the one ANGEL VEGA was observed carrying on September 6, 2006 (see paragraph 24 above), containing a clear plastic bag inside with residue. This substance was analyzed by the DEA lab as having Cocaine Hydrochloride residue. Two fingerprints detected, and identified as PACHECO's, were recovered from the two yellowish-brown mailing envelopes containing cocaine residue;

(f) a purple and black Eastsport backpack with residue.  This substance was analyzed by the DEA lab as having Cocaine Hydrochloride residue;

(g) a white "Ace Hardware" plastic bag containing a digital scale with residue.  This substance was analyzed by the DEA lab as having Cocaine Hydrochloride residue;

(h) a gray "GNC" bottle containing Inositol;

(i) one box of .38 caliber Winchester Ammunition;

(j) one Ace Hardware plastic bag containing one package of paper plates, coffee filters, plastic baggies, and rubber bands;

(k) a roll of aluminum foil;

(l) a box of plastic sandwich bags;

(m) a bottle of "Odor Away" air freshener; and

(n) two 1-quart bottles of Acetone.

Based on my training and experience, your Affiant knows that the food processor, Inositol, acetone, scale, aluminum foil, coffee filters and plastic baggies are all items commonly used to dilute or "cut" cocaine or package it for resale.

32.   After observing a white powdery substance on the kitchen counter, your Affiant performed a cocaine swab test kit.  The test reflected the presence of cocaine.

### E.     December 19, 2006 Seizure of Cocaine, United States Currency and Drug Paraphernalia

33.   On December 19, 2006, surveillance was established on PACHECO in the area of 4910 North Karlov Avenue in Chicago, Illinois.   At approximately 3:30 p.m., surveillance followed PACHECO, who was driving the Ford Expedition, from 4910 Karlov to 15238 S. Rosarie Drive in Homer Glen, Illinois (the "Rosarie Drive residence").    Upon PACHECO's arrival at the Rosarie Drive residence, an Elgin Police Department Detective observed PACHECO exit the Expedition and go to the rear hatch of the truck where he removed a yellowish-brown envelope from the back of the truck.

34.   Surveillance observed PACHECO as he went inside the Rosarie Drive residence carrying the yellowish-brown envelope. This envelope appeared to be the same type of envelope that

surveillance observed in ANGEL VEGA'S possession on September 6, 2006 (see paragraph 24), and the same type of envelope containing cocaine recovered during the execution of the search warrant at 507 Reyerson (see paragraphs 30 and 31).

35. While PACHECO was inside the residence, another vehicle pulled into the driveway. Surveillance observed a white male, later identified as Individual F, enter the Rosarie Drive residence and exit approximately three minutes later. As Individual F drove away from the Rosarie Drive residence, two Elgin Police Detectives conducted an investigative stop on the vehicle driven by Individual F. Individual F was asked to step out of the vehicle and was advised of some of the agents' observations leading up to the stop. Individual F replied words to the effect, "let me be honest with you" and handed one of the detectives approximately 1.2 grams of cocaine out of his front shirt pocket. Individual F told the detectives that he had just purchased the cocaine from "Randy" for $100. Individual F further stated that he had been buying cocaine from "Randy" for more than twenty years. The cocaine was seized and Individual F was allowed to leave without being charged.

36. Agents maintained surveillance on the Rosarie Drive residence. At approximately 4:50 p.m., surveillance observed PACHECO leave the Rosarie Drive residence carrying a jacket in his hand and enter the Ford Expedition. As PACHECO departed the area, law enforcement conducted an investigative stop of the vehicle.

19

The jacket that agents observed PACHECO wearing as he entered the residence was recovered from the vehicle. Upon examining the jacket, agents found approximately $5,340 in United States currency. Agents further conducted a pat down search of PACHECO and further searched the Ford Expedition. Agents did not recover from PACHECO or the vehicle the envelope that they observed PACHECO remove from the rear hatch of the vehicle prior to entering the residence.

37. Law Enforcement subsequently went to the Rosarie Drive residence. After identifying themselves as law enforcement and being granted access to the residence, agents spoke with the owner of the residence who identified himself as Randy Pine. PINE was asked for consent to search the residence. PINE initially offered to get the drugs and turn them over to one of the agents. The agent asked PINE if he would instead tell the agents where the drugs were located so that they could recover them. In response, PINE motioned toward some kitchen cabinets underneath a countertop and stated that the drugs were in there. Upon opening a cabinet, agents observed an envelope sitting next to a glass jar that appeared to be the same envelope that PACHECO was observed carrying into the residence earlier that evening (see paragraph 34). The glass jar contained five plastic bags of suspect cocaine. The yellow envelope contained three plastic bags of suspect cocaine. Agents further observed and recovered $8252 in United States

currency on the countertop above the cabinet where the suspect cocaine was recovered.

38. The suspect cocaine was subsequently submitted to the DEA laboratory for chemical analysis. The substance recovered from the five plastic bags placed in the glass jar tested positive for the presence of cocaine and weighed approximately 221.7 grams. The substance recovered from the yellow enveloped further tested positive for the presence of cocaine and weighed approximately 300.9 grams. Three fingerprints, identified as PACHECO's, were detected on the yellowish-brown mailing envelope which contained approximately 221.7 grams of cocaine, recovered during the search at the Rosarie Drive residence.

39. After agents recovered the suspect cocaine and cash referred to in paragraph 37, PINE signed a written consent to search form, and agents recovered the following additional items: (a) a Smith and Wesson .44 Magnum Model 292, bearing serial number N336663; (b) six rounds of .44 caliber ammunition; and (c) a Sig Sauer .357 automatic, bearing serial number SP0001108, in a case with two empty magazines.

40. After leaving PINE's residence, law enforcement agents proceeded to the residence located at 4910 North Karlov and met with INDIVIDUAL G, who advised affiant that she lived at the residence with her boyfriend, PACHECO. INDIVIDUAL G advised affiant that the rental agreement on the house was in her name and

21

that she and PACHECO received mail at this address.    INDIVIDUAL G
signed a written consent to search form for the residence located
at 4910 Karlov.    During the search, agents recovered a digital
scale containing residue and approximately three yellow envelopes.
The digital scale was subsequently submitted to the DEA Laboratory
and, after chemical analysis, tested positive for the presence of
cocaine residue.

V.    CONCLUSION

Based on the foregoing, there is probable cause to believe that LUIS PACHECO and ANGEL VEGA conspired with each other and others known and unknown to the United States to knowingly and intentionally possess with intent to distribute and to distribute controlled substances, namely in excess of 500 grams of mixtures containing cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2.

MICHAEL J. CULLOTON
Special Agent
Federal Bureau of Investigation


SUBSCRIBED AND SWORN TO BEFORE ME
this 20th day of February, 2008

HONORABLE NAN R. NOLAN
United States Magistrate Judge

23